# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Stacey Wayman, individually and on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Wells Fargo & Company; Human Resources Committee of the Wells Fargo Board of Directors; Wells Fargo Employee Benefit Review Committee; Wells Fargo Chief Administrative Officer; Wells Fargo Director of Human Resources; Wells Fargo Director of Compensation and Benefits; Lloyd H. Dean; John S. Chen; Susan E. Engel; Donald M. James; Stephen W. Sanger; Richard D. McCormick; Mackey J. McDonald; John G. Stumpf; Patricia Callahan; Hope A. Hardison; Justin C. Thornton; John R. Shrewsberry; Howard Atkins; Kevin Odin; Stanhope Kelly; Dawn Martin Harp; Suzanne Ramos; James Steiner; George Wick; Martin Davis; Thomas Wolfe; Timothy J. Sloan; Michael Heid; and John Does 1-10,<br><br>Defendants. | Civil Action No.: _____<br><br><br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Stacey Wayman, by and through her attorneys, on behalf of the Wells Fargo & Company 401(k) Plan (the "Plan"), herself, and all others similarly situated, alleges the following:

## I.   INTRODUCTION

1.   This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1009 and 1132 against

Wells Fargo & Company ("Wells Fargo" or the "Company"), the Human Resources Committee of the Wells Fargo Board of Directors ("HR Committee"), the Wells Fargo Employee Benefit Review Committee ("Benefit Review Committee"), the Chief Administrative Officer, the Director of Compensation and Benefits, the Director of Human Resources, Lloyd H. Dean, John S. Chen, Susan E. Engel, Donald M. James, Stephen W. Sanger, Richard D. McCormick, Mackey J. McDonald, John G. Stumpf, Patricia Callahan, Hope A. Hardison, Justin C. Thornton, John R. Shrewsberry, Howard Atkins, Kevin Odin, Stanhope Kelly, Dawn Martin Harp, Suzanne Ramos, James Steiner, George Wick, Martin Davis, Thomas Wolfe, Timothy J. Sloan, Michael Heid and John Does 1-10 (collectively, "Defendants").

2.      Defendants, the Plan's fiduciaries, breached their duties of loyalty and prudence to the Plan and its participants, including Plaintiff, by failing to establish and use a systematic and unbiased review process to evaluate the performance and cost, regardless of their affiliation to Wells Fargo, of the investment options in the Plan's portfolio.   As a result of this failure to review the portfolio adequately, the Plan participants, including Plaintiff, paid higher than necessary fees for both Wells Fargo-branded and managed investment options ("proprietary investment options" or "proprietary funds") and certain non-proprietary investment options for years.

3.      The Plan, like other 401(k) plans, confers benefits such as tax deferred growth for contributions, to incentivize saving for retirement or other long-term goals. Employees who participate in a 401(k) plan are limited to the investment options selected by the plan's fiduciaries.   As 401(k) plans have become the main vehicle for employees

to save for retirement, plan fiduciaries' actions and inactions with regards to a plan's menu of investments have a dramatic effect on the amount of money employees will have for retirement.

4.      Here, Defendants' breaches of their fiduciary duties of prudence and loyalty owed to the Plan and its participants are demonstrated by, among other things, Defendants' lack of a systematic and unbiased review of the Plan's investment options, which resulted in, *inter alia*:  (a) including higher cost and poorly performing proprietary investment options in the Plan to the detriment of Plan participants; (b) failing to use the Plan's enormous size (between $22.8 billion and $39.4 billion in assets during the Class Period (defined below))[1] to negotiate lower fees for both proprietary and non-proprietary investment options included in the Plan;[2] (c) maintaining a proprietary money market fund alongside a better performing and significantly cheaper stable value fund; and (d) failing to switch higher cost and poorly performing investment options for cheaper and better performing options available in the market.

---

[1] All Plan asset data is collected from the Plan's Form 5500s for the years 2010 through 2015, which are filed with the Department of Labor. *See* https://www.efast.dol.gov/portal/app/disseminate?execution=e1s3.

[2] *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 10   https://www.ici.org/pdf/per22-04.pdf (noting that the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds).

5.     As noted above, during the Class Period the Plan has been one of the largest 401(k) plans in the United States in terms of assets.[3] Even though the Plan is and has been one of the largest in the country, Defendants maintained investment options that charged Plan participants fees that were significantly higher than were available to a plan of its size.  Moreover, Defendants engaged in self-dealing by selecting and maintaining proprietary investment options that both cost more than and underperformed other mutual funds available in the market, which cost Plan participants millions of dollars in excessive fees and poor performance.  As a result of these actions and inactions, Defendants, as fiduciaries of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to Plaintiff and to the other participants and beneficiaries of the Plan in violation of §§ 404(a) and 405, 29 U.S. C. §§ 1104(a) and 1105.

6.     Specifically, Plaintiff alleges in Count I that Defendants breached their fiduciary duties to Plaintiff and the members of the Class by failing to prudently and loyally manage the Plan's investments by:  (a) retaining Wells Fargo proprietary investment options in the Plan despite the availability of similar lower cost and better performing investment options; (b) failing to leverage the Plan's size to select investments with low fees, or to negotiate lower fees for the investments already included in the Plan; and (c) including and then failing to remove a money market fund when a

---

[3]     Nick Thornton, *The 10 Biggest 401(k)s*, BENEFITS PRO, http://www.benefitspro.com/2015/02/17/the-10-biggest-401ks?slreturn=1483410842&page=4 (listing the 10 largest 401(k) plans in terms of assets as of Feb. 17, 2015, and ranking the Plan as the third largest).

cheaper and better performing stable value fund was already available in the Plan.  These actions/inactions cost Plan participants millions of dollars and run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

7.      Plaintiff's Count II alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were failing to manage the Plan and its investment portfolio in a prudent and loyal manner as required by ERISA.

8.      This action seeks recovery of losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in proprietary and certain non-proprietary investment options during the Class Period, and because ERISA specifically authorizes participants such as the Plaintiff to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## II.      JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and

pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

10.    This Court has personal jurisdiction over Defendants because they are headquartered and transact business in, or reside in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process.

11.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and because the Plan is administered in this District. *See* Exhibit A, 2016 Summary Plan Description (the "2016 SPD"), at 2 (listing the Plan administrators as being located in Minneapolis, Minnesota). Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

**PLAINTIFF**

12.    Plaintiff Stacey Wayman is a resident and citizen of the State of Pennsylvania. Plaintiff Wayman was employed by Wells Fargo as a Mortgage Underwriter from December 2009 to April 2014 and is a current Plan participant. During the Class Period, Plaintiff Wayman was and continues to be invested in the following plan investment options: (i) the Wells Fargo 100% Treasury Money Market Fund; (ii) the U.S. Bond Index Fund; (iii) the Wells Fargo Dow Jones Target 2040 Fund; (iv) the Large Cap Value Fund; and (v) the Lazard Emerging Markets Equity Fund.

13.     Plaintiff Wayman did not have knowledge of all material facts (including, among other things, the cost of the investments in the Plan relative to alternative investments that were available to the Plan but not offered by the Plan) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.  Further, Plaintiff Wayman did not have and does not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed a jumbo 401(k) plan, Plaintiff Wayman lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  Plaintiff Wayman did not and could not review Benefit Review Committee meeting minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof.  For purposes of this Complaint, Plaintiff Wayman has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**D**EFENDANTS

**Company Defendant**

14.     Defendant Wells Fargo is the Plan Sponsor and is one of the nation's largest financial services companies, providing banking and financial services across the world and holding approximately $1.5 trillion in assets.  Wells Fargo is headquartered in San Francisco, California, but conducts business throughout the United States.

15.     Wells Fargo is the Plan Sponsor within the meaning of 29 U.S.C. § 1002(16)(B), is a participating employer in the Plan, and provides funding for the Plan.

16.     At all times, Wells Fargo acted through the HR Committee, Chief Administrative Officer, Plan Administrator and Benefit Review Committee Defendants, identified below, to perform Plan-related fiduciary functions in the course and scope of their employment.   Through the HR Committee, or otherwise, Wells Fargo had the authority and discretion to hire, appoint or designate, and the concomitant duty to monitor and supervise the Benefit Review Committee, the Plan Administrator Defendants, and the Director of Human Resources and the Director of Compensation and Benefits.   By failing to properly discharge their fiduciary duties under ERISA, the HR Committee, the Benefit Review Committee and the Plan Administrator Defendants breached duties they owed to the Plan and its participants.   Accordingly, the actions of these Defendants are imputed to Wells Fargo under the doctrine of *respondeat superior*, and Wells Fargo is liable for these actions.

17.     Wells Fargo is a fiduciary of the Plan, within the meaning of  ERISA Section 3(21)(A, 29 U.S.C. § 1002(21)(A) because through its selection, management, and supervision of the HR Committee, the Benefit Review Committee, the Director of Human Resources, and the Director of Compensation and Benefits, Wells Fargo exercises discretionary authority or discretionary control concerning management of the Plan, as well as discretionary authority and responsibility with respect to the administration of the Plan and the disposition of Plan assets.

**HR Committee Defendants**

18.     Defendant HR Committee, which is a committee of the Wells Fargo Board of Directors, has the power to appoint and/or supervise individuals with responsibility for managing the Plan's assets, including the Director of Human Resources, the Director of Compensation and Benefits and the Wells Fargo Chief Administrative Officer. *See* Exhibit B, Wells Fargo & Company 401(k) Plan, as Amended and Restated January 1, 2010 (the "2010 Plan Document"), at § 13.1; Exhibit C, Wells Fargo & Company Human Resources Committee Charter, at 2 (stating that the HR Committee has the power to review and approve the Company's executive officers). Prior to February 1, 2011, the HR Committee also appointed the members of the Benefit Review Committee. After this date, the Director of Human Resources, along with the Chief Administrative Officer, had the authority to appoint the Benefit Review Committee. *See* 2010 Plan Form 5500 at 4.

19.     The HR Committee was a Named Fiduciary under the Plan. *See* 2010 Plan Document at § 2.26. Each of the HR Committee Defendants identified below is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

20.     Defendant Lloyd H. Dean ("Dean") serves as Chairman of the HR Committee and has been a member of the HR Committee throughout the Class Period.

21.     Defendant John S. Chen ("Chen") serves on the HR Committee and has been a member throughout the Class Period.

22.    Defendant Susan E. Engel ("Engel") serves on the HR Committee and has been a member throughout the Class Period.

23.    Defendant Donald M. James ("James") serves on the HR Committee and has been a member throughout the Class Period.

24.    Defendant Stephen W. Sanger ("Sanger") serves on the HR Committee and has been a member throughout the Class Period.

25.    Defendant Richard D. McCormick ("McCormick") was a member of the HR Committee until May 2013.

26.    Defendant Mackey J. McDonald ("McDonald") was a member of the HR Committee until April 2012.

27.    Defendants HR Committee and its individual members, Defendants Dean, Chen, Engel, James, Sanger, McCormick, and McDonald are collectively referred to herein as the "HR Committee Defendants."

**Chief Administrative Officer Defendants**

28.    Defendant Chief Administrative Officer is a senior executive at Wells Fargo whose duties include the appointment of members of the Benefits Review Committee.  *See* 2011 Plan Form 5500 at 4.  During the Class Period, at least two individuals served as the Chief Administrative Officer.  Each of the Chief Administrative Officer Defendants was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

29.    Defendant Patricia Callahan ("Callahan") is the former Chief Administrative Officer at Wells Fargo, a position she held from 2011 through August 2015.  In her role as Chief Administrative Officer, she appointed at least two members of the Benefit Review Committee during the Class Period.

30.    Defendant Hope A. Hardison ("Hardison") is the current Chief Administrative Officer at Wells Fargo, a position she has held since August 2015.  In her role as Chief Administrative Officer, she appointed at least one member of the Benefit Review Committee during the Class Period.

31.    Defendants Callahan and Hardison are collectively referred herein as the "Chief Administrative Officer Defendants."

**Plan Administrator Defendants**

32.    Defendant Director of Human Resources is one of the Plan Administrators and a Named Fiduciary.  *See* Exhibit D, Wells Fargo & Company 401(k) Plan, as Amended and Restated January 1, 2016 (the "2016 Plan Document"), at §§ 2.29, 2.35. The Director of Human Resources is a senior executive at Wells Fargo.  In her role as the Plan Administrator, the Director of Human Resources is empowered "[t]o adopt and enforce such rules and regulations and prescribe the use of such forms as may be necessary to carry out the provisions of the Plan," 2016 Plan Document at § 12.3(a), and she has, along with the Director of Compensation and Benefits, "sole authority … to make any determinations required in the administration of the Plan." 2016 Plan Document at § 12.1.  Since February 1, 2011, the Director of Human Resources also has

authority to appoint, along with the Chief Administrative Officer, the members of the Benefit Review Committee.  *See* 2010 Plan Form 5500 at 4.

33.     Defendant Director of Compensation and Benefits is also one of the Plan Administrators and a Named Fiduciary.  *See* Plan Document at § 2.26.  The Director of Compensation and Benefits is a senior executive at Wells Fargo.  In his or her role as the Plan Administrator, the Director of Compensation and Benefits is empowered "[t]o adopt and enforce such rules and regulations and prescribe the use of such forms as may be necessary to carry out the provisions of the Plan," 2016 Plan Document at § 12.3(a), and he has, along with the Director of Human Resources, "sole authority … to make any determinations required in the administration of the Plan."  *Id.* at § 12.1.

34.     As Plan Administrator, the Director of Human Resources and the Director of Compensation and Benefits exercised discretionary authority with respect to the management and administration of the Plan.

35.     Accordingly, the Plan Administrator Defendants were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

36.     Defendant Hardison is the current Director of Human Resources for Wells Fargo and the Plan Administrator.  She has been in this position for the entirety of the Class Period.  Defendant Hardison identified herself as the Plan Administrator in signing the Plan's Form 5500 filed with the Department of Labor ("DOL") for the plan year ending in 2010.  *See* 2010 Plan Form 5500.

37.    Defendant Justin C. Thornton ("Thornton") is the current Director of Compensation and Benefits at Wells Fargo and the Plan Administrator.  Defendant Thornton identified himself as the Plan Administrator in signing the Plan's Forms 5500 filed with the DOL for the plan years ending in 2011 through 2015.

38.    The Plan Administrator and any individual acting on behalf of the Plan Administrator, including Defendants Hardison and Thornton, are collectively referred to herein as the "Plan Administrator Defendants."

**Benefit Review Committee Defendants**

39.    Defendant Benefit Review Committee is a Named Fiduciary under the Plan.  *See* 2016 Plan Document at § 2.29.  The Benefit Review Committee is charged with the selection and monitoring of specific investment options within the Plan and has the "authority to control or manage the assets of the Plan."  *Id*.  The Benefit Review Committee may also appoint investment managers to manage any assets of the Plan.  *Id*. at § 12.2(c).  The members of the Benefit Review Committee are senior Wells Fargo executives selected previously by the HR Committee and currently selected by the Chief Administrative Officer and the Director of Human Resources to serve on the Committee.

40.    Each of the Benefit Review Committee Defendants identified below were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

41.    Defendant John R. Shrewsberry ("Shrewsberry") is a Senior Executive Vice President and Wells Fargo's Chief Financial Officer.  He served as a member of the Benefit Review Committee from January 1, 2010 through May 14, 2014.

42.    Defendant Howard Atkins ("Atkins") was Wells Fargo's former Chief Financial Officer.  He served as a member of the Benefit Review Committee from the beginning of the Class Period through February 2011.

43.    Defendant Kevin Oden ("Oden") is Executive Vice President and Head of Operational Risk and Compliance within Corporate Risk at Wells Fargo.  He is a current member of the Benefit Review Committee, and has been since December 8, 2014.

44.    Defendant Callahan, the former Chief Administrative Officer of Wells Fargo, was a member of the Benefit Review Committee from January 1, 1999 through August 31, 2015.

45.    Defendant Stanhope Kelly ("Kelly") served as Wells Fargo's lead regional president for the Carolinas, covering retail, small business and business banking operations until his retirement in 2014.  He served on the Benefit Review Committee from March 1, 2009 through June 30, 2014.

46.    Defendant Dawn Martin Harp ("Harp") was a member of the Wells Fargo Management Committee and served as the head of Wells Fargo Dealer Services. Defendant Harp was a member of the Benefit Review Committee, March 1, 2016 until her departure in April 2017.

47.    Defendant Suzanne Ramos ("Ramos") is a member of Wells Fargo's Management Committee.   She serves as Executive Vice President, Wells Fargo's

National Affluent Sales Leader.  Defendant Ramos is a current member of the Benefit Review Committee, and has been since December 1, 2010.

48.     Defendant James Steiner ("Steiner") is the president of Abbot Downing, a Wells Fargo brand that caters to ultra-high net worth clients.  He is a current member of the Benefit Review Committee, and has been since July 1, 2011.

49.     Defendant George Wick ("Wick") is the head of Principal Investments for Wells Fargo Securities.  He is a current member of the Benefit Review Committee, and has been since March 15, 2015.

50.     Defendant Martin Davis ("Davis") served as the head of enterprise technology services, executive vice president, and chief technology officer for Wells Fargo until his departure in mid-2015.  He served as a member of the Benefit Review Committee from March 1, 2009 through December 10, 2014.

51.     Defendant Thomas Wolfe ("Wolfe") was head of the Consumer Credit Solutions Group at Wells Fargo.   He served as a member of the Benefit Review Committee from March 1, 2012 through August 31, 2014.

52.     Defendant Timothy J. Sloan ("Sloan") is the current Wells Fargo President and Chief Executive Officer and also currently serves as a member of the Benefit Review Committee.

53.     Defendant Michael Heid ("Heid") is Wells Fargo's Head of Home Lending and served on the Benefit Review Committee until September 2015.

54.    Defendant John G. Stumpf ("Stumpf") was Wells Fargo's former President, Chief Executive Officer, and Chairman of the Board of Directors.  Defendant Stumpf served as a member of the Benefit Review Committee until October 2016.

55.    Defendant Benefit Review Committee, as well as all individual members of the Benefit Review Committee during the Class Period, including Defendants Shrewsberry, Atkins, Oden, Callahan, Kelly, Harp, Ramos, Steiner, Wick, Davis, Wolfe, Sloan, Heid, and Stumpf are collectively referred to herein as the "Benefit Review Committee Defendants."

**John Doe Defendants**

56.    To the extent that there are additional officers and employees of Wells Fargo who were fiduciaries of the Plan during the Class Period, or were hired as an investment management for the Plan during the Class Period, including members of the HR or Benefit Review Committees, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-10 including other individuals, including, but not limited to, Wells Fargo officers and employees who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY BREACHES

57.    As noted above, during the Class Period, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary

authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

58.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

59.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

60.    At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)    they were so named; and/or

(b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)    they had discretionary authority or discretionary responsibility in the administration of the Plan.

61.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence.

62.    The duty of loyalty also includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.  As noted in an Advisory Opinion 88-16A by the DOL:

> …in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income.  A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

1988 WL 222716, at *3 (Dec. 19, 1988).

63.    During the Class Period, the Defendants acted in the interests of the Company and/or themselves, to the detriment of the Plan and its participants and beneficiaries, by including and retaining in the Plan mutual fund investments from Wells Fargo or a related company that were more expensive than necessary, and not prudent.

64.     Not only did the Defendants include these investments out of self-interest, they failed to disclose the conflict of interest to Plaintiff and members of the Class.

65.     Pursuant to 29 U.S.C. § 1104(a)(1)(B), ERISA also mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments including all associated fees.

66.     During the Class Period, upon information and belief, Defendants failed to have an independent system of review in place to ensure that Plan Participants were being charged appropriate and reasonable fees for both proprietary and non-proprietary investment options.   Defendants also failed to monitor the performance of these investments and refused to remove the investments that performed well-below their competitors.   Additionally, Defendants failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained or added to the Plan during the Class Period.

## V.     CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the proposed class (the "Class") defined as follows:

>    All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between November 17, 2011 and the present (the "Class Period").

68.     The members of the Class are so numerous that joinder of all members is impractical.   Upon information and belief, the Class includes hundreds of thousands of

persons. *See* Form 5500 for Plan year-ending 2011 (reporting that as of January 1, 2011, the Plan had 399,907 participants); 2016 Plan Form 5500 (reporting that as of January 1, 2016, the Plan had 358,087 participants).

69.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' actions/inactions.

70.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

(a)    Whether Defendants are fiduciaries of the Plan;

(b)    Whether Defendants breached their fiduciary duties of loyalty and prudence with respect to the Plan by virtue of the actions and inactions alleged herein;

(c)    Whether Defendants breached their duty of loyalty by including investment options which benefited themselves to the detriment of the Plan's participants;

(d)    Whether certain Defendants failed to monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA; and

(e)    Whether the Plan fiduciaries breached their fiduciary duties in failing to comply with the provisions of ERISA set forth above.

71.    Plaintiff will fairly and adequately represent the Class, and has retained counsel experienced and competent in the prosecution of ERISA class action litigation.

Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

72.    This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

73.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

74.    Class certification is also alternatively appropriate under FED. R. CIV. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against

Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## VI.    THE PLAN

75.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

76.    The Plan's original effective date was January 1, 1953. Upon information and belief, it has been restated several times, most recently as of January 1, 2015.

77.    Between the beginning of 2011 and the end of 2016, the Plan maintained between $22.8 billion and $39.4 billion in assets, and currently has more than 350,000

participants,[4] making it one of the largest in the country.  So-called "jumbo plans," or multi-billion dollar defined contribution plans such as the Plan, wield tremendous bargaining leverage, and can readily obtain high-quality investment management and administrative services at a very low cost.

78.     Instead of using the Plan's bargaining power to obtain such services at extremely low costs, to the benefit of participants and beneficiaries, Defendants selected and retained high-cost and poor-performing investments compared to the alternatives available to such an enormous plan.  Such action and inaction caused the Plan participants to pay unreasonable fees for investment options.

79.     Both regular and part-time employees are eligible to participate in the Plan so long as:  (1) they have completed one full calendar month of service (eligible participation starts on the first day following the full calendar month); (2) are classified as regular or part-time employees by Wells Fargo; (3) they have certified compensation in a pay period in which they are actively employed at least one day; or (4) are employed by a participating employer.  *See* 2016 SPD, at 3.

80.     Eligible employees can make salary deferral contributions from the certified compensation earned during the entire pay period containing the date in which the employee's salary deferral election is effective.  *Id.*  Eligible employees also receive employer matching and employer discretionary profit sharing contributions.  *Id.* Employees receive the employer matching contributions as of the first day of the calendar quarter following completion of a 365-day period of employment, with Wells Fargo

---

[4] *See* 2011 Plan Form 5500 and 2016 Plan Form 5500.

matching up to 6% of an employee's salary deferral contributions.  *Id.* at 9.  Employees who were employed at Wells Fargo as of January 1, 2010, and after, are 100% vested in their employer matching contribution.  *Id.* at 12.

81.    Wells Fargo may also provide a profit sharing contribution of up to 4% of eligible certified compensation for the Plan year in discretionary profit sharing contributions.  *Id.*  Employees are eligible to receive the discretionary profit sharing contribution if: (1) they are eligible to actively participate in the Plan, even if they have made no salary deferrals during the applicable plan year; (2) they have completed one year of service with Wells Fargo; (3) they are a regular or part-time member on the last day of the plan year; (4) they received certified compensation from a participating employer during the Plan year; (5) they are not on a salary continuation leave on the last day of the Plan year; and (6) are employed by a Wells Fargo participating employer on the last day of the plan year.  *Id.*

82.    Further, according to the Plan's 2013 Summary Plan Description, attached hereto as Exhibit E, the Plan offered a "Quick Enrollment" feature (renamed "Easy enrollment" on December 9, 2016, *see* 2016 SPD, at 6-7).  The Quick Enrollment feature provided a preset deferral contribution of 2% of certified compensation coupled with a 1% increase to the contribution rate annually until the overall contribution level reached 12% of certified compensation.  *Id.* at 6.  Employee contributions made using the Quick Enrollment feature were invested in one of Wells Fargo's target date funds included in the Plan that correlated the appropriate target retirement date with the employee's date of birth.  *Id.*

83.    For all participants who enrolled in the Plan but failed to select an investment, the Wells Fargo target date funds were the default investment options of the Plan throughout a majority of the Class Period (after December 9, 2016, the Wells Fargo target date funds were replaced with Wells Fargo target date collective trusts). *Id.* at 16. In practice, employees who elected to make contributions to the Plan but failed to select an investment option for the contributions were by default enrolled in the Wells Fargo Target Date Fund that matched their estimated retirement year based on age. *See id.*

## VII.    SPECIFIC ALLEGATIONS

### A.    The Importance of the Investment Options Available to Plan Participants

84.    The Company established and maintained the Plan for the benefit of the employees of Wells Fargo and its subsidiaries.  The Plan includes and has provided a number of investment vehicles for Plan participants to invest their assets in, including Company stock, mutual funds, collective investment trusts or funds ("CIT" or "CIF"), and separate accounts.

85.    Each investment option within the Plan has charged certain fees, to be paid by deductions from the pool of assets under management.  For passively managed investment options, which are designed to mimic a market index such as the Standard & Poor's 500 ("S&P 500"), securities were purchased to match the mix of companies within the index.  Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees because there is no need to actively research the mix of securities to be included.

86.     By contrast, actively managed investment options, which have a mix of securities selected in the belief they will beat the option's benchmark index, charge higher fees to account for the work of investment managers.

87.     Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act § 7.  *See also* DOL, *A look at 401(k) Plan Fees* (Aug. 2013), at 2, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited November 1, 2017) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.")  This is because, as described by the DOL, a one percent difference in fees and expenses can reduce a participant's retirement account balance by 28 percent over 35 years.  *Id*.

88.     Nor is a reduction in a plan participant's account balance merely academic. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  *See* Brandon, Emily, "The Top 10 Sources of Retirement Income," available at http://money.usnews.com/money/blogs/planning-to-retire/2014/05/13/the-top-10-sources-of-retirement-income (last visited November 1, 2017) ("'The 401(k) is the major source people think they are going to rely on.'").  Although at all times these accounts are fully funded, that does not prevent a plan's

participants from losing money due to poor investment menu construction by plan fiduciaries, whether due to poor performance or high fees.

**B.    Improper Management of an Employee Retirement Plan Can Cost a Plan's Participants Millions in Savings**

89.    The DOL has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "*A look at 401(k) Plan Fees.*"

90.    The duty to evaluate and monitor fees includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio, or a percentage of assets under management within a particular investment. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

91.    Because the investment choices for plan participants are limited, Plan fiduciaries have a responsibility to take into account the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan.

92.    On average, there are lower expense ratios for employer-sponsored retirement plan participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, leading

to great competition among mutual funds in the marketplace. Furthermore, the large average account balances of such plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds. *Id*. at 10.

93.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios have fallen 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *Id*. at 1.

94.     The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years[5].

---

[5] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management. Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

FIGURE 7
**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id.* at 12.

95.    Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, investigating alternatives in the marketplace, and leveraging the size of their plan to ensure that well-performing, low cost investment options are being made available to plan participants. This is especially critical because 401(k) accounts are long-term investments in which employees dutifully invest during their working career, often over a period of decades, for the purpose of saving for retirement.

96.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The    Washington    Post,    available    at    https://www.washingtonpost.com/news/get-

there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/    (last    visited

November 1, 2017) (citing a study by S&P Dow Jones Indices which looked at 2,862

actively managed mutual funds, focused on the top quartile in performance and found

most did not replicate performance from year to year).  In fact, one of the key findings in

a study conducted by Morningstar study was:

> Actively managed funds have generally underperformed their
> passive counterparts, especially over longer time horizons,
> and experienced high mortality rates (*i.e.* many are merged or
> closed).  In addition, the report finds that failure tends to be
> positively correlated with fees (*i.e.* higher cost funds are more
> likely to underperform or be shuttered or merged away and
> lower-cost funds were likelier to survive and enjoyed greater
> odds of success).

*See* Morningstar's Active/Passive Barometer: A new yardstick for an old debate, at 2

(June                    2015),                    available                    at

http://corporate.morningstar.com/US/documents/ResearchPapers/MorningstarActive-

PassiveBarometerJune2015.pdf (last visited November 1, 2017).

97.    Conversely, mutual funds with the worst performance tend to continue to

perform poorly in the future.  Jonathan B. Berk, Jing Xu, *Persistence and Fund Flows of*

*the   Worst   Performing   Mutual   Funds*,   at   6   (2004),   available   at

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.421.2127&rep=rep1&type=pdf

(last visited November 1, 2017) (attributing continuing poor mutual fund performance to

less responsive investors who do not pull their capital from the funds, causing the fund

manager to change strategies).

98.    Plan fiduciaries such as Defendants must be continually mindful of investment options to ensure such options do not unduly risk plan participants savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts and separate accounts, which provide lower fee alternatives to even institutional and retirement plan specific shares of mutual funds.  In selecting collective trusts and separate accounts, plan fiduciaries overseeing large plans can leverage the size of their plans to negotiate significantly lower fees.  For example, plans with over $500 million in assets can hire investment-managers to create separate accounts, which like collective trusts, pool plan participants' investments and allow large plans to achieve economies of scale with pricing.  *See* U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, § 2.4.1.3 (Apr. 13, 1998), available at https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/401kRept.pdf (last visited November 1, 2017) (noting that large plans with over $500 million can realize substantial savings through separate accounts).

99.    However, even collective trusts and separate accounts must be actively monitored and continually evaluated to ensure that plan participants are not paying higher fees than necessary or subject to unduly poor performance on their investments.

100.    Plan fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select proprietary funds as investment options for the plans they administer.  The inherent conflict of interest in such situations can cause proprietary funds to be selected when they are not the most prudent investment option and can cause those same funds to remain as an investment option despite poor performance.

101.   In fact, one recent Pension Research Council working paper found in a study of such situations that "[a]ffiliated funds are more likely to be added and less likely to be removed from 401(k) plans" especially for the worst performing funds. *See* Pool, Veronika, Clemons Sialm, and Irina Stefenescu, *It Pays to Set the Menu: Mutual Fund investment Options in 401(k) Plans*, at 2 (May 2015).   Moreover, even though plan participants may be aware of the affiliation, due to their documented naivety in investments and general inactiveness in changing those investments, the study found "participants are not generally sensitive to poor performance and do not undo the [] bias towards affiliated families [of funds]." *Id*. at 3.

102.   The fact that fiduciaries may have "superior information about their own proprietary funds" does not correlate to improved performance. *Id*.   "[A]ffiliated funds that rank poorly based on past performance but are not deleted from the menu do not perform well in the subsequent year" and thus "the decision to retain poorly-performing affiliated funds is not driven by information about the future performance of these funds." *Id*. at 3, 26.

103.   Given the vulnerability of plan participants, who are presented a menu of very limited choices but who are dependent on the retirement income earned by those choices, plan fiduciaries must be particularly vigilant about the selection and maintenance of affiliated, proprietary funds in their 401(k) plans.

104.   Therefore, as demonstrated above, prudent plan fiduciaries have in place and execute a systematic and unbiased review process that can, among other things, leverage the size of the plan's assets to offer the lowest cost investments in a variety of

investment vehicles, ensure that the fees of the plan's investment options are appropriate for the plan's size, and remove any imprudent proprietary investment options.

### C. Defendants' Breaches of Fiduciary Duty

#### 1. Defendants Breached their Fiduciary Duties by Failing to Minimize Expenses and Allowing Excessively-Costly Investments to Remain in the Plan for Years[6]

105.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015). *Tibble* held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act (referred to hereinafter as the "UPIA"), treatises, and seminal decisions confirming the duty.

106.    The UPIA, which enshrines trust law, and recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ." *Id.* (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)).  The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." UPIA § 2 comment.

---

[6] All investment option fee and expense ratio data is pulled directly from Plan documents reporting to Plan participants the net fees or expense ratio the investment options charge.

107.    As described *supra*, one of the responsibilities of the Plan fiduciaries is to select investment options which have reasonable and not excessive fees for the performance and quality of service received, and to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."   Restatement (Third) of Trusts ch. 17, intro. note (2007).  *See also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.")  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in the Plan to determine whether any of the Plan's investments are "improvident," or if there is a "superior alternative investment" to any of the Plan's holdings.  *See Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013); *Harley v. Minnesota Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 906-907 (D. Minn. 1999).

108.    As the amount of assets under management approaches and exceeds $1 billion, the economies of scale dictate that lower cost investment options will be available to these plans.  When large plans, particularly those with over $1 billion in assets, have options which approach the retail cost of shares for individual investors, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

109.    As demonstrated below, for a number of the proprietary and non-proprietary investment options included in the Plan, the Plan's fiduciaries failed to leverage the size of the Plan's substantial assets to negotiate or create lower fee

investment options for the Plan's participants.  Indeed, for both the proprietary and non-proprietary investment options included below, the expense ratios Plan participants paid did not meaningfully decline, if at all, even though the Plan's assets substantially increased throughout the Class Period.  Accordingly, the fees paid by Plan participants were excessive and unreasonable.  Moreover, the high fees of the proprietary investment options and the sheer size of the assets Plan participants maintained in the proprietary funds guaranteed Wells Fargo and its affiliates tens of millions in profits from fees.

        (a)       **The Fiduciaries' Selection and Retention of Wells Fargo Proprietary Funds Cost the Plan Millions in Excessive Fees**

              (i)       **Retaining More Expensive Identical Versions of Wells Fargo Proprietary Funds Cost Plan Participants Millions in Excessive Fees**

110.    From the beginning of the Class Period until December 9, 2016, the Plan's fiduciaries maintained eleven proprietary Wells Fargo target date funds in the Plan.[7] Throughout the Class Period, the WF Target Funds charged Plan participants fees of between 30 basis points and 37 basis points.[8]  Wells Fargo Funds Management, LLC, a

---

[7] The eleven proprietary Wells Fargo target date funds were the:  Wells Fargo Dow Jones Target Today Fund (WOTDX); Wells Fargo Dow Jones Target 2010 Fund (WFOAX); Wells Fargo Dow Jones Target 2015 Fund (WFSCX); Wells Fargo Dow Jones Target 2020 Fund (WFOBX); Wells Fargo Dow Jones Target 2025 Fund (WFTYX); Wells Fargo Dow Jones Target 2030 Fund (WFOOX); Wells Fargo Dow Jones Target 2035 Fund (WFQRX); Wells Fargo Dow Jones Target 2040 Fund (WFOSX); Wells Fargo Dow Jones Target 2045 Fund (WFQPX); Wells Fargo Dow Jones Target 2050 Fund (WFQFX); and Wells Fargo Dow Jones Target 2055 Fund (WFQUX) (collectively the "WF Target Funds").  The WF Target Funds were also named the "Wells Fargo Advantage Dow Jones Target Date Fund" during some portions of the Class Period.

[8] One basis point ("bp") is equal to 1/100th of one percent (or 0.01%).

Wells Fargo subsidiary, managed these funds; thus, Wells Fargo ultimately reaped the benefits from the fees Plan participants paid.

111.    On December 9, 2016, the Plan's fiduciaries converted the WF Target Funds from mutual funds to CITs (collective trusts) with expense ratios of 12 bps for each WF Target CIT.[9]  The WF Target CITs were *identical* to the WF Target Funds in terms of investment strategy and investment selection.

112.    As explained by the *Wall Street Journal*, collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds, and cash.   Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs.  *See* Powell, Robert, *Not Your Normal Nest Egg*, THE WALL STREET JOURNAL,          March          2013,          available          at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144   (last

---

[9] The CITs are managed and trusteed by Wells Fargo Bank N.A. under a declaration of trust established by Wells Fargo.  Wells Fargo, as trustee of the CITs, is advised by State Street Global Advisors, which is the investment management division of State Street Bank & Trust Company ("SSGA").  The CITs map the WF Target Date Funds and are named as follows:  Wells Fargo/State Street Target Today CIT; Wells Fargo/State Street Target 2010 CIT; Wells Fargo/State Street Target 2015 CIT; Wells Fargo/State Street Target 2020 CIT; Wells Fargo/State Street Target 2025 CIT; Wells Fargo/State Street Target 2030 CIT; Wells Fargo/State Street Target 2035 CIT; Wells Fargo/State Street Target 2040 CIT; Wells Fargo/State Street Target 2045 CIT; Wells Fargo/State Street Target 2050 CIT; and Wells Fargo/State Street Target 2055 CIT (collectively the "WF Target CITs").

visited November 1, 2017). Collective trusts generally maintain expense ratios of between 15 basis points to 60 basis points lower than the ***same*** asset class mutual fund.

113. Another feature of collective trusts is that they are customizable to a particular employer. "Plan sponsors can work with banks and trust companies to create a target-date fund that has a specific asset allocation or glide path built around its workforce and employee-benefit package." *Id*. Fiduciaries of large retirement plans have a duty to leverage the substantial bargaining power derived from the amount of their plan's assets to obtain lower fees either through lower-cost institutional share classes for investment management services or CITs and CIFs that utilize the strategy of an already existing mutual fund.

114. The fiduciaries also must consider the size and purchasing power of their plan and select the share classes or alternative investments that are most appropriate for that plan's participants. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

115. Defendants were at all times during the Class Period aware of the benefits of collective trust vehicles compared to mutual funds, and of the significant bargaining power that the Plan wielded due to its large pool of assets.

116. Rather than use their unique position to benefit the Plan and its participants by offering the WF Target Funds in collective trust vehicles, Defendants instead opted to offer the higher cost proprietary mutual funds because of the benefit they returned to Wells Fargo and its affiliated companies.

117.   The decision to keep the WF Target Funds, proprietary mutual funds, as investment options, instead of offering these same investments as CITs sooner than December 9, 2016, cost the Plan's participants millions of dollars in excess fees over the course of the Class Period.

118.   Had the Plan's fiduciaries converted the WF Target Funds into the lower cost WF Target CITs in 2011, Plan participants would have saved millions in fees paid over the course of the Class Period.  For managing the WF Target Funds for the Plan years 2011 through 2016, Wells Fargo and its affiliates received approximately $79.13 million in fees from Plan participants.[10]  If the Plan's fiduciaries had converted the WF Target Funds into the lower expense ratio WF Target CITs at the beginning of 2011, Plan participants would have only paid fees of approximately $26.68 million.[11]  Thus, the Plan's fiduciaries' failure to convert the WF Target Funds into the lower cost WF Target CITs resulted in Plan participants having at least $52.45 million less in savings for retirement.[12]  The chart below demonstrates the wide gulf between the approximate fees

---

[10] Plaintiffs' fee figure is a ballpark calculation based off of the publicly available fee data of the WF Target Funds.   The real figure is likely higher.

[11] Potential fees were calculated by multiplying the assets for each WF Target Fund, for each year between 2011 and 2016, by the 12 bp fee that each of the WF Target CITs charge.

[12] In fact, the true cost to Plan participants is higher as they also missed out on the growth that they would have realized on the growth of the money they would have saved from paying the lower fee.  *See Tibble*, 843 F.3d at 1198 ("[b]eneficiaries subject to higher fees … lose not only the money spent on higher fees, but also 'lost investment opportunity;' that is, the money that the portion of their investment spent on unnecessary fees would have earned over time.")

Plan participants paid for the WF Target Funds and the fees they would have paid had the Plan's fiduciaries converted the funds into the lower cost WF Target CITs earlier:



119.   At all times during the Class Period, the Plan's fiduciaries could have converted the WF Target Funds into the lower cost WF Target CITs.   The Plan's fiduciaries had access to the same affiliates and investment management advisors with whom they worked to create the WF Target CITs.[13]   Each of the WF Target Funds maintained enough assets during the Class Period to satisfy the minimum amount investment managers required to create a CIT.[14]   Even if the assets for each WF Target

---

[13] Wells Fargo N.A., the trustee of the WF Target CITs, is a Wells Fargo subsidiary. Moreover, Defendants maintained numerous SSGA CITs in the Plan throughout the Class Period and thus were aware of SSGA's services and of CITs long before December 9, 2016.   For example, the Plan included the following SSGA managed, *inter alia*, CITs/common collective funds throughout the Class Period: the SSgA International Index Fund, the SSgA Nasdaq 100 Index Fund, the SSgA Russell Small Cap Index Fund.

[14] Throughout the Class Period each of the WF Target Funds have had more than $50 million dollars in assets (with the exception of the first few years after the inclusion of the Wells Fargo Dow Jones Target 2055 Fund), such amount being well above what investment management advisors require to create and manage a CIT.   At least one WF

Fund did not satisfy the minimums of some investment management advisors, the WF Target Funds' cumulative assets did (from 2011 through 2016, the WF Target Funds cumulatively maintained between $2.7 billion and $4.74 billion dollars in assets).

120.    During the Class Period, the Plan's fiduciaries did not need the benefit of hindsight to understand that if Plan participants paid lower fees for the Plan's investment options, they would have higher returns and, therefore, more money for retirement, which is the goal of 401(k) accounts.  Defendants should have especially realized the effect of high fees on participants' WF Target Fund investment because most of the WF Target Fund investments had a long-term investment profile.  For example, most of the target date funds were for those retiring in 2025 and beyond.  Accordingly, the Plan's fiduciaries can provide no reasonable explanation for their failure to undertake cost-cutting measures, which they had the ability to undertake, earlier in the Class Period.

121.    One recent article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent."  Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Jan. 21, 2016), available at http://www.investmentnews.com/article/20160121/BLOG09/160129985/recent-class-action-surge-ups-the-ante-for-401-k-advice (last visited November 1, 2017).

---

Target Fund (the Target 2025 fund) maintained close to $1 billion in assets early in the Class Period, which then exceeded $1 billion in the middle of the Class Period.

122.    Indeed, recently a court observed in an analogous situation that "[b]ecause the institutional share classes are otherwise *identical* to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary—who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs—to switch share classes **immediately**." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017) (emphasis added).  The same goes for a failure to switch to a collective trust that shares the same investment strategy.

123.    The Plan's fiduciaries' failure to undertake such measures earlier in the Class Period demonstrates that there was no standardized, routine critical review of the Plan investment options by impartial, unbiased committee members and/or the Defendants.   A prudent and impartial fiduciary would have conducted such reviews throughout the Class Period.   Indeed, the Plan's fiduciaries were incentivized not to undertake such a review because Wells Fargo and its affiliates were profiting from the higher fees, which earned Wells Fargo and its affiliates at least $52.45 million in fees from Plan participants' investment in the WF Target Funds.

> **(ii)    Use of a Wells Fargo Proprietary Fund in the Wells Fargo Small Cap Fund Cost Plan Participants Millions in Unnecessary Fees**

124.    On October 8, 2009, the Wells Fargo Small Cap Fund ("WF Small Cap Fund"), a multi-manager fund, was added to the Plan.  During the Class Period, the WF

Small Cap Fund has been comprised of five investment options weighted as follows: (1) the Wells Fargo Advantage Small Cap Growth Fund/Wells Fargo Advantage Emerging Growth Fund[15] (16.5%) (hereinafter the "WF Small Cap Growth Fund"); (2) the SSgA Russell Small Cap Index Fund (34%); (3) the Advisory Research Small Cap Value Fund (16.5%); (4) the Wellington Small Cap Value Fund (16.5%); and (5) the Wellington Select Small Cap Growth Fund (16.5%). Thus, Plan participants who chose and choose to invest in the WF Small Cap Fund have had their contributions proportionally invested in those five funds.

125. Because Wells Fargo Funds Management, LLC, ("Wells Fargo Funds Management") a Wells Fargo subsidiary, managed one of these funds throughout the Class Period—the WF Small Cap Growth Fund—Wells Fargo ultimately reaped the profits from the fees Plan participants paid for this fund. However, had the Plan's fiduciaries diligently exercised their fiduciary duties by conducting a systematic and unbiased review of the proprietary WF Small Cap Growth Fund, they would have discovered that cheaper market alternatives, which have the same investment style as the fund, were readily available. For example, as demonstrated in the chart below, the Janus Triton Fund had outperformed the WF Small Cap Growth Fund on a one, five, and ten year basis for the period ending December 31, 2010[16]:

---

[15] After August 19, 2011, the Wells Fargo Advantage Small Cap Growth Fund was merged into the Wells Fargo Advantage Emerging Growth Fund.

[16] The Janus Triton Fund and the WF Small Cap Growth Fund have been in same asset category (Small Growth) and have had the same benchmark index, the Russell 2000 Growth, throughout the Class Period. Additionally, the Janus and the WF Funds have the same top five sector holdings (Technology, Healthcare, Financial Services, Industrials



126.    A systematic and unbiased review of the Plan's investment options would have revealed the better performing and cheaper market alternative (in 2011, the Janus Triton Fund charged a fee of 71 basis points whereas the WF Small Cap Growth Fund charged a fee of 75 basis points).[17]    At the beginning of the Class Period, the cost and performance superiority of the Janus Triton Fund would have been evident to a prudent and loyal fiduciary.    Accordingly, the Plan's fiduciaries did not need the benefit of hindsight to understand that if Plan participants' assets were invested in the lower cost and better performing investment option available at the beginning of the Class Period, they would have higher returns and, therefore, more money for retirement.

---

and Consumer Cyclical) and two of the same top five company holdings.  Despite their similarities, the Janus Triton Fund has also outperformed the WF Small Cap Growth Fund for the one, five, and ten year periods ending December 31, 2016.

[17] Whereas the WF Small Cap Growth Fund has charged Plan participants a fee of 75 bps throughout the Class Period, the Janus Triton Fund's fee has decreased from 71 bps at the beginning of the Class Period to 67 bps at the end.

127.   The Plan's fiduciaries' lack of systematic and unbiased review procedures to replace the expensive proprietary WF Small Cap Growth Fund is also evident from the Plan's fiduciaries' failure to leverage the Plan's size to negotiate or create a lower fee CIT or separate account for the same asset class mutual funds.   Just like the Plan's fiduciaries replaced the WF Target Funds with the lower cost WF Target CITs, they could also have replaced the WF Small Cap Growth Fund with an identical but cheaper CIT or separate account.

128.   Each year, the Plan's fiduciaries allocated between $142 million and $226 million of Plan participants' assets into the WF Small Cap Growth Fund for the 2011 through 2016 Plan years.   Thus, each year there were more than enough assets in the WF Small Cap Growth Fund to convert it into a CIT or a separate account.   No reasonable explanation can justify the Plan's fiduciaries' failure to diligently exercise their fiduciary duties of prudence and loyalty by not converting the WF Small Cap Growth Fund into a lower cost CIT or separate account (or replacing it with a cheaper and better performing market alternative, like the Janus Triton Fund).

129.   Like CITs, separate accounts allow for significant cost saving and customization.   For example, among others, separate accounts have the advantageous feature of providing the ability to use economies of scale to negotiate fees and the ability to avoid advertising fees associated with mutual funds.   According to the DOL, separate accounts, which require a minimum investment of $15 million to $25 million per

account, can "commonly" reduce "[t]otal investment management expenses" to "one-fourth of the expenses incurred through retail mutual funds."[18]

130.    Had the Plan's fiduciaries converted the WF Small Cap Growth Fund into a separate account at the beginning of the Class Period, Plan participants could have paid 19 basis points for the WF Small Cap Growth Fund, which is one fourth of the 75 basis points Plan participants paid.  That reduction in the expense ratio would have saved Plan participants millions in fees throughout the Class Period.  The millions in fees that the Plan's fiduciaries caused Plan participants to pay for the more expensive WF Small Cap Growth Fund—as compared to the available cheaper and better performing funds, such as the Janus Triton Fund and a lower cost CIT or separate account version of the Fund—were excessive and unreasonable and demonstrate that the Plan's fiduciaries were incentivized to not undertake a systematic and unbiased review of the Plan's investment options so as to benefit Wells Fargo and its affiliates at the expense of Plan participants.

(iii)    **Use of a Wells Fargo Proprietary Fund in the Wells Fargo Large Cap Growth Fund Cost the Plan Millions**

131.    On October 8, 2009, the Wells Fargo Large Cap Growth Fund ("WF Large Cap Growth Fund"), a multi-manager fund, was added to the Plan.  During the Class Period the WF Large Cap Growth Fund has been comprised of numerous investment options weighted as follows:  (1) the Wells Fargo Advantage Capital Growth Fund (33%) from at least the beginning of 2011 to sometime before April 1, 2012 (hereinafter "WF

---

[18] U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, § 2.4.4 (Apr. 13, 1998), available at http://www.dol.gov/ebsa/pdf/401krept.pdf.

Growth Fund"); (2) the Neuberger Berman Disciplined Large Cap Growth Fund (33%) from 2011 to sometime before October 1, 2013; (3) the Winslow Large Cap Growth Fund (33%) from sometime in 2012 to sometime before October 1, 2013; (4) the T. Rowe Price Blue Chip Growth Fund (34%) during the whole of the Class Period; (5) the L.A. Capital Large Cap Growth Fund (33%) from sometime after October 1, 2013, and during the rest of the Class Period; and (6) the Delaware U.S. Growth Fund (33%) from sometime after October 1, 2013, and during the rest of the Class Period.

132.    Because Wells Fargo Funds Management managed the proprietary WF Growth Fund, Wells Fargo ultimately reaped the benefits from the fees Plan participants paid.  However, had the Plan's fiduciaries diligently exercised their fiduciary duties by conducting a systematic and unbiased review of the Plan's proprietary investment options, they would have discovered that cheaper market alternatives, which had the same investment style as the proprietary WF Growth Fund, were readily available.

133.    For example, such a review at the beginning of 2011 would have revealed that the cheaper and better performing market alternative Vanguard PRIMECAP Fund (VPMAX) had outperformed the WF Growth Fund for the five year period ending December 31, 2010, as demonstrated in the chart below:



134.   In 2011, the Vanguard PRIMECAP Fund charged a fee of 36 basis points whereas the WF Growth Fund charged a fee of 55 basis points.  Thus, for the 2011 Plan year and some of the 2012 Plan year, Plan participants paid 19 basis points higher for a worst performing fund.  In 2011, the Vanguard PRIMECAP Fund had a yearly return of -1.77% whereas the WF Growth Fund had a yearly return of -5.46%.  The difference in fees and performance cost Plan participants millions of dollars.  Given the availability of cheaper and better performing fund alternatives, the fees paid by Plan participants were excessive and unreasonable.

        **(iv)**    **Use of a Wells Fargo Proprietary Fund in the Wells Fargo International Equity Fund Cost the Plan Millions in Unnecessary Fees**

135.   On November 13, 2012, the Plan's fiduciaries added the Wells Fargo International Equity Fund ("WF International Equity Fund"), a multi-manager fund, to

the Plan. The WF International Equity Fund has been comprised of the following proportionally weighted funds during the Class Period: (1) the American Funds EuroPacific Growth Fund (50%); (2) the Harbor International Fund Institutional (25%); and (3) the Wells Fargo/Thornburg International fund and later in the Class Period the Wells Fargo International/Causeway International Value Fund (hereinafter the "WF International Value Fund") (25%). Prior to the creation of the WF International Equity Fund, the EuroPacific Growth Fund was the main actively managed international stock fund offered to Plan participants.

136. Wells Fargo Bank N.A. has been the trustee and manager of the WF International Equity Fund and numerous investment firms have provided subadvisory services during the Class Period. Thus, Wells Fargo and its affiliates reaped most of the fees Plan participants paid for the WF International Value Fund.

137. Each year during the Class Period, the Plan's fiduciaries allocated between $310 million and $355 million, of the assets Plan participants invested in the WF International Equity Fund, into the WF International Value Fund. The WF International Value Fund charged Plan participants between 54 basis points and 55 basis points throughout the Class Period. As a result, the Plan's participants paid millions in fees to boost the profits of Wells Fargo and its affiliates. However, had the Plan's fiduciaries undertaken a systematic and unbiased review of the proprietary WF International Value Fund, they would have discovered that cheaper and similar, if not better, performing alternatives were available in the market.

138.    Indeed, the WF International Value Fund has been a CIT throughout the Class Period yet Plan participants paid an expense ratio higher than a ***mutual fund*** included in the WF International Equity Fund—the EuroPacific Growth Fund—which charged Plan participants between 52 basis points and 49 basis points during the Class Period.  Mutual funds should rarely, if ever, have lower expense ratios than CITs and separate accounts, which as described above have certain beneficial cost cutting features but do not sacrifice performance.

139.    Separate accounts and CITs offered by Pacific Investment Management Company LLC ("PIMCO") demonstrate that cheap alternatives were available in the market for 401(k) plans with available assets in the billions.  For example, PIMCO requires a minimum of $100 million dollars to create a RAE Fundamental International separate account.  Such an account would charge 35 basis points for the first $50 million, 30 basis points for the next $50 million, and 25 basis points thereafter.  If the Plan's fiduciaries had hired PIMCO, for example, to manage the $310 million to $355 million in assets allocated to the WF International Value Fund, Plan participants would have paid 27 basis points, less than half of what Plan participants have paid for the WF International Value Fund.  Given the ready availability of cheaper investments with identical investment strategies, the fees paid by Plan participants were excessive and unreasonable.

**(v)  Defendants Breached their Fiduciary Duties by Including and Maintaining a Poor Performing and Expensive Money Market Fund Alongside a Better Performing and Cheaper Stable Value Fund**

140.  The Wells Fargo 100% Treasury Market Fund (the "WF Money Market Fund") is an SEC-registered proprietary Wells Fargo money market mutual fund *designed for retail investors*, not giant institutional investors seeking to protect the principal value of their investment while generating current income.  The Money Market Fund invests in short-term U.S. dollar-denominated money market instruments that consist of U.S. Treasury obligations.  As the DOL has explained:

> Money market accounts are actually mutual funds that invest in short term (typically 90 days or less), fixed income securities.  As such, they are often considered as cash equivalents… most often used as parking accounts for money waiting to be invested in other instruments, as sweep accounts for the collection of dividends, or by very risk averse investors.[19]

141.  Defendants added the WF Money Market Fund as an investment option to the Plan on June 1, 2011.  Short-term interest rates in the United States have been at or near zero percent since the global financial crisis of 2008.[20]

142.  At the time Defendants added the WF Money Market Fund, Defendants should have known that U.S. short term interest rates based on U.S. dollar-denominated

---

[19] U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, § 2.4.4 (Apr. 13, 1998), available at https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/401kRept.pd.

[20] Vanguard, Money Market Reform and Stable Value: Considerations for Plan Fiduciaries, Vanguard Commentary, at 5 (Aug. 2016), available at https://institutional.vanguard.com/iam/pdf/ISGSVMM.pdf?cbdForceDomain=true.

treasuries were at historically low levels and, as such, the WF Money Market Fund would have a negative return due to inflation.

143.    However, Defendants need not have included the WF Money Market Fund at all because the Plan already maintained a stable value fund that provided Plan participants returns that beat inflation for the years prior to and after the inclusion of the WF Money Market Fund.  As demonstrated in the graph below, the Stable Value Fund significantly outperformed the Money Market Fund for the four years prior to the inclusion of the Money Market Fund in the Plan:



144.    A prudent fiduciary would not include a money market fund in a plan when the plan offers a cheaper and better performing stable value fund.  Academic studies have demonstrated that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences."  David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011).

145.    Similarly, in the years since the inclusion of the WF Money Market Fund, the Stable Value Fund has significantly outperformed the WF Money Market Fund.  As demonstrated by the graph below, the Stable Value Fund and the WF Money Market Fund returned the following inflation adjusted growth for the years 2011 through 2015:



146.    Because Defendants failed to employ appropriate methods to investigate the merits of the WF Money Market Mutual Fund after years of near-zero short-term interest rates, Plan participants holding investments in the WF Money Market Fund had their retirement savings diminished on an inflation-adjusted basis.

147.    In return for the negative growth rate due to inflation, Plan participants paid fees ranging from 6 basis points to 12 basis points from 2011 through 2016.  At the end of the 2011 Plan year, Plan participants maintained approximately $187.6 million in the WF Money Market Fund and by the end of the 2016 Plan year participants maintained approximately $501.55 million.  The growth of the WF Money Market Fund's assets

from 2011 through 2016 is completely attributable to Plan participants' contributions because, as demonstrated above, the WF Money Market Fund had no positive growth during those years. During this time, Plan participants paid at least seven hundred thousand dollars more in fees than they otherwise would not have paid had they invested their money in the Stable Value Fund (upon information and belief, during this time the Stable Value Fund had a nominal expense ratio of 0 basis points or 1 basis points).

148. However, Plan participants who invested in the WF Money Market Fund lost significantly more due to the negative returns of the WF Money Market Fund on an inflation-adjusted basis. Had Plan participants invested their money in the Stable Value Fund, as they likely would have had it been the only option, Plan participants would have realized an average growth rate of 2.28% per year for the five year period from 2011 through 2016.

149. A prudent fiduciary would not have included the WF Money Market Fund nor maintained the WF Money Market Fund in the Plan when the Plan already offered the better performing and cheaper stable value fund. As a result of including and maintaining the WF Money Market Fund alongside the Stable Value Fund, Defendants breached their fiduciary duties owed to Plan participants and cost them millions of dollars in losses.

> **(b)** **The Fiduciaries' Selection and Retention of Certain Non-Proprietary Funds Cost the Plan Millions in Excessive Fees**
>
> > **(i)** **The Unreasonably High Costs of Non-Proprietary Small Cap Funds Cost the Plan Millions in Unnecessary Fees**

150.    As part of the WF Small Cap Fund, the Plan's fiduciaries have maintained the Wellington Select Small Cap Growth Fund, the Wellington Small Cap Value Fund, and the Advisory Research Small Cap Fund ("non-proprietary Small Cap Funds") in the Plan throughout the Class Period.[21]

151.    The Plan's fiduciaries' lack of a systematic and unbiased review process caused Plan participants to pay the same unnecessarily high expense ratio for the non-proprietary Small Cap Funds throughout the Class Period.  Had there been a systematic and unbiased review process, the Plan's fiduciaries could have utilized the WF Small Cap Funds' growing assets (between $877 million in 2011 and $1.22 billion in 2015) to, among other things:  (1) negotiate lower fees for the funds already in the Plan; (2) replace existing funds with cheaper market alternatives; or (3) hire investment managers to create similar funds with lower expense ratios.

152.    As demonstrated in the chart below, the expense ratios of the Wellington Select Small Cap Growth Fund, the Wellington Small Cap Value Fund, and the Advisory Research Small Cap Fund did not decrease during the Class Period:

---

[21] In the Plan's Form 5500s, each of the non-proprietary Small Cap Funds is identified as a "common collective fund."  Upon information and belief, these common collective funds are either CITs or separate accounts.



153.   However, the assets of each of the non-proprietary Small Cap Funds increased from an average of $145 million in 2011 to $228 million in 2016 for each fund. This non-reduction in fees when the WF Small Cap Funds' assets **significantly increased** during the Class Period, demonstrates that the Plan fiduciaries did not leverage the size of the Plan's significant assets to negotiate lower fees for any of the non-proprietary Small Cap Funds.

154.   The non-proprietary Small Cap Funds' expense ratios throughout the Class Period have been significantly higher than what Plan participants should have paid for these CITs or separate accounts.  In fact, these expense ratios are closer to the fees retail mutual funds charge retail investors than what investors in jumbo sized plans are charged for CITs and separate accounts.  Thus, the fees paid by Plan participants were excessive and unreasonable.   Indeed, there were numerous market alternative ***mutual funds*** available throughout the Class Period that were cheaper than the non-proprietary Small Cap Funds.

155.    During the Class Period, the following cheaper mutual funds were available in the market:  (1) the DFA US Targeted Value Fund (DFFVX); (2) the Janus Triton Fund (JSMGX then JGMNX)[22]; (3) the DFA US Small Cap Value Fund (DFSVX); and (4) the T. Rowe Price Institutional Small-Cap Stock Fund (TRSSX).  If **any** of the aforementioned had been offered within the WF Small Cap Fund, either individually or collectively, Plan participants would have saved millions in fees and would have realized millions more in growth throughout the Class Period.  As demonstrated in the chart below, each of the above market alternative mutual funds charged a lower expense ratio than each of the non-proprietary Small Cap funds:



---

[22] In 2012, Class N shares with a lower fee and under ticker symbol JGMNX became available.

156.    Thus, had the Plan's fiduciaries conducted a systematic and unbiased review of the Plan's investment options, they would have discovered that they could have utilized the above actively-managed small cap blend *mutual funds* from companies such as Vanguard, Dimensional Fund Advisors, T. Rowe Price, and/or Janus that cost from 25% to more than 50% percent less than the non-proprietary Small Cap Funds. Furthermore, the Plan fiduciaries could have also hired numerous investment advisors including Massachusetts Financial Services, Columbia Management, T. Rowe Price, and/or Goldman Sachs Asset Management, to manage a separate account holding small company stocks that would have cost at least 25% to 50% less than the expense ratios charged by the non-proprietary Small Cap Funds.

157.    For example, T. Rowe Price requires a minimum investment of $50 million to create an actively-managed small cap blend separate account. For such an account, T. Rowe Price charges 75 basis points for the first $20 million and 60 basis points for any sum above $20 million. If the Plan fiduciaries had hired T. Rowe Price as the investment manager for any or all of the non-proprietary Small Cap Funds, Plan participants would have been charged between 61 basis points and 62 basis points for maintaining between $140 million and $215 million in assets in each of the funds for the 2011 through 2015 Plan years. This is a reduction of more than 25% in fees over the Wellington Small Cap Value Fund, more than 29% over the Advisory Research Small Cap Fund fee, and more than 39% over the Wellington Select Small Cap Growth Fund.

158.    The fact that the fees of the WF Small Cap Growth Fund and the non-proprietary Small Cap funds stayed constant while the funds' assets increased throughout

the Class Period, demonstrates that the Plan's fiduciaries did not exercise their fiduciary duties of prudence and loyalty diligently, if at all.  As demonstrated above, the Plan's fiduciaries could have undertaken a number of actions to reduce the fees Plan participants paid for the proprietary and non-proprietary investment options in the WF Small Cap Fund, however, the Plan fiduciaries failed to do so.

159.    The failure of the Plan's fiduciaries to conduct a systematic and unbiased review of the Plan's investment options cost Plan participants millions in unnecessary fees paid.  In fact, all of the investment options comprising the WF Small Cap Fund are still included in the Plan and still charge the same fee as they did at the beginning of the Class Period.

> **(ii)    The Unreasonably High Costs of the Non-Proprietary Funds in the WF Large Cap Growth Fund Cost the Plan Millions in Unnecessary Fees**

160.    Besides favoring the inclusion of proprietary funds in the Plan in lieu of cheaper and better performing non-proprietary market alternatives, the Plan's fiduciaries failed to utilize the significant assets Plan participants maintained in the WF Large Cap Growth Fund's investment options to negotiate or seek lower fee alternatives.  During various times in the Class Period, the Plan's fiduciaries maintained four non-proprietary CITs or separate accounts in the WF Large Cap Growth Fund:  (1) the Neuberger Berman Large Cap Disciplined Fund; (2) the T. Rowe Price Blue Chip Growth Fund; (3) the Winslow Large Cap Growth Fund; (4) the Los Angeles Large Cap Growth Fund

(collectively "non-proprietary Large Cap Growth Funds");[23] and (5) one mutual fund, the Delaware U.S. Growth Fund.

161.    Had the Plan's fiduciaries diligently exercised their fiduciary duties by conducting a systematic and unbiased review of the WF Large Cap Growth Fund's non-proprietary investment options, they would have discovered that cheaper market alternatives that had the same investment style as the non-proprietary options were readily available.  For example, the following mutual funds were available throughout the Class Period:  the Vanguard US Growth Fund (VWUAX); the Vanguard PRIMECAP Fund (VPMAX); and the State Street Institutional Premier Growth Equity Fund (SSPGX).  If *any* of the aforementioned had been offered in the WF Large Cap Growth Fund, either individually or collectively, Plan participants would have saved millions in fees and would have realized millions more in growth throughout the Class Period.

162.    For demonstrative purposes, the chart below compares the average weighted fee charged by the investment options maintained in the WF Large Cap Growth Fund throughout the Class Period and the average weighted fee the Vanguard US Growth Fund, the Vanguard PRIMECAP Fund, and State Street Institutional Premier Growth Equity Fund would have charged had they replaced the investment options in the WF Large Cap Growth Fund:

---

[23] In the Plan's Form 5500s each non-proprietary Large Cap Growth Fund is described as a "common collective fund."  Upon information and belief, these common collective funds are either CITs or separate accounts.



163.    As demonstrated in the chart above, the Vanguard US Growth Fund, the Vanguard PRIMECAP Fund, and State Street Institutional Premier Growth Equity Fund would have charged Plan participants a significantly lower average weighted fee throughout the Class Period.  Thus, had the Plan's fiduciaries diligently exercised their fiduciary duties of prudence and loyalty and included these funds instead, Plan participants would have saved millions in fees and would thus have had more money for retirement.[24]

164.    Moreover, the fact that cheaper market alternative **mutual funds** were available in lieu of the non-proprietary Large Cap Growth Funds, which are CITs or separate accounts, demonstrates that the Plan's fiduciaries did not diligently exercise their fiduciary duties of prudence and loyalty.  The four non-proprietary Large Cap Growth Funds included in the Plan throughout various times in the Class Period had expense

---

[24] In fact, the true cost to Plan participants is higher as they also missed out on the growth that they would have realized on the growth of the money they would have saved from paying the lower fee.

ratios ranging from 37 basis points to 55 basis points whereas the expense ratios of the market alternative mutual funds ranged from 32 basis points to 38 basis points. Mutual funds should rarely, if ever, have lower expense ratios than CITs and separate accounts. Thus, the fees paid by Plan participants were excessive and unreasonable. Additionally, CITs or separate accounts that maintain the amount of assets in each of the non-proprietary Large Cap Growth Funds (averaging $324 million for each fund at the beginning of the Class Period and $665 million for each fund at the end) command cheaper expense ratios.

165. For example, PIMCO requires a $100 million investment for its RAE Fundamental U.S. Large Cap separate account. For such an account, PIMCO charges 30 basis points for the first $50 million, 25 basis points for the next $50 million, and 20 basis points for anything thereafter. Such an account would have charged Plan participants 22 basis points for managing the $324 million allocated for each investment option in the WF Large Cap Growth Fund at the beginning of the Class Period and 21 basis points for the $624 million allocated towards the end of the Class Period. Such fees are 43% less than the lowest fee of 37 basis points charged by one of the non-proprietary Large Cap Growth Funds, and approximately 62% less than the highest fee of 55 basis points charged by one of the non-proprietary Large Cap Growth Funds. Thus, had the Plan's fiduciaries hired PIMCO to create at least one, or multiple, of the investment options for the WF Large Cap Growth Fund, Plan participants would have saved millions in fees.

166. Even when the Plan's fiduciaries replaced certain of the WF Large Cap Growth Funds' investment options in the middle of the Class Period, as for example they

did in 2013 by adding the Delaware U.S. Growth Fund, the Plan's fiduciaries did not consider cheaper and better performing market alternatives.    Had they diligently exercised their fiduciary duties of prudence and loyalty, the Plan's fiduciaries would have considered the cheaper and better performing State Street Institutional Premier Growth Equity Fund ("State Street Fund").    As demonstrated in the chart below, the State Street Fund had outperformed the Delaware U.S. Growth Fund on a one, five, and ten year basis for the period ending December 31, 2012[25]:



167.    A systematic review of the Plan's investment options would have revealed the better performing and cheaper market alternative (in 2013 the State Street Fund charged a fee of 38 basis points whereas the Delaware U.S. Growth Fund charged a fee of 54 basis points).    In 2013, the cost and performance superiority of the State Street Fund

---

[25] The State Street Fund and the Delaware U.S. Growth Fund have been in the same asset category (Large Growth) and have had the same benchmark index, the Russell 1000 Growth, throughout the Class Period.    Additionally, the State Street Fund has outperformed the Delaware U.S. Growth Fund for the three year period ending December 31, 2015, *i.e.*, since the Delaware U.S. Growth Fund was added to the Plan.

would have been evident to a prudent and loyal fiduciary.  Accordingly, the Plan's fiduciaries did not need the benefit of hindsight in 2016 to understand that if Plan participants' assets were invested in the lower cost and better performing investment option available at the beginning of the Class Period, they would have higher returns and, therefore, more money for retirement.  Therefore, the Plan fiduciaries' failure to replace the Delaware U.S. Growth Fund with the State Street Fund, or a similar cheaper and better performing fund, demonstrates that they breached their fiduciary duties to prudently and loyally manage the Plan's assets.

168.    Moreover, the Plan's fiduciaries could have also considered cheaper CITs or separate accounts like the ones offered by PIMCO above in lieu of the Delaware U.S. Growth Fund.  Additionally, the Plan's fiduciaries could have maintained the Delaware U.S. Growth Fund as a CIT or separate account, which likely would have been at least 25% cheaper than the mutual fund variety.  The Plan's fiduciaries' failures to undertake any of the cost saving actions presented above demonstrates that the Plan's fiduciaries did not execute their fiduciary duties of prudence and loyalty diligently, if at all, with regards to the investment options offered in the WF Large Cap Growth Fund throughout the Class Period.

        **(iii)**    **The Unreasonably High Fees of the Non-Proprietary Investments in the WF International Equity Fund Cost the Plan Millions in Unnecessary Fees**

169.    Additionally, for the non-proprietary funds in the WF International Equity Fund, the Plan's fiduciaries failed to leverage the size of the Plan's assets in the Fund to

negotiate or create lower fee alternative investment options.  Between 2011 and 2016, the EuroPacific Growth Fund charged Plan participants between 52 basis points and 49 basis points.  For the 2011 Plan year, and most of the 2012 Plan year, Plan participants maintained more than $1.1 billion in the EuroPacific Growth Fund, and for the rest of the Class Period Plan participants maintained above $600 million in the fund (in fact, in 2013 Plan participants' assets in the EuroPacific Growth Fund reached $700 million). Similarly, the Harbor International Fund charged Plan participants at least 66 basis points since its inclusion in the Plan in November, 2012, and since then, Plan participants have maintained between $310 million and $359 million in assets in the fund.

170.    Had the Plan's fiduciaries undertaken a standardized, routine critical review of the Plan investment options by impartial, unbiased fiduciaries, they would have discovered that they could have leveraged the size of the assets in the EuroPacific Growth Fund and the Harbor International Fund to negotiate lower fees or create investment options with lower fees.  A prudent and impartial fiduciary would have conducted such reviews throughout the Class Period.

171.    For the EuroPacific Growth Fund and the Harbor International Fund, Plan participants were charged fees that retail investors with assets in the mere thousands would have been charged, much less the hundreds of millions that the Plan invested in those options.[26]  Accordingly, the fees paid by Plan participants were excessive and unreasonable.  These high fees for funds with assets in the hundreds of millions of dollars

---

[26] The minimum investment amount for the EuroPacific Growth Fund is $250 whereas for the Harbor International Fund the minimum investment amount is $50,000.

demonstrates that the Plan's fiduciaries lacked a systematic and unbiased review process that would have revealed the significant cost cutting measures they could have undertaken throughout the Class Period.

### (iv)    The Unreasonably High Fees for the Non-Proprietary Investments in the Wells Fargo Large Cap Value Fund Cost the Plan Millions

172.   On October 8, 2009, the Wells Fargo Large Cap Value Fund ("WF Large Cap Value Fund"), a multi-manager fund, was added to the Plan. For a majority of the Class Period, the WF Large Cap Value Fund has been comprised of the following three proportionally weighted funds: (1) the Dodge & Cox Stock Fund ("Stock Fund") (33%); (2) the T. Rowe Price Equity Income Fund ("T. Rowe Fund") (34%); and (3) the MFS Large Cap Value Fund ("MFS Fund") (33%) (collectively the "non-proprietary Large Value Funds").[27] Thus, Plan participants who chose to invest in the WF Large Cap Value Fund had their contributions proportionally distributed among those three funds.

173.   Had the Plan's fiduciaries diligently exercised their fiduciary duties by conducting a systematic review of the WF Large Cap Value Fund's non-proprietary investment options, they would have discovered that cheaper market alternatives that had the same investment style as the non-proprietary options were readily available. For example, the following mutual funds were available throughout the Class Period: the Vanguard Equity-Income Fund (VEIRX); the DFA U.S. Large Cap Value III Portfolio (DFUVX); and the Vanguard Mega Cap Value Index Fund (VMVLX). If *any* of the

---

[27] The Wells Fargo Advantage Intrinsic Value Fund was included as part of the WF Large Cap Value Fund until March 28, 2011, when it was replaced by the T. Rowe Fund.

aforementioned had been offered in the WF Large Cap Value Fund, or offered instead of the WF Large Cap Value Fund, either individually or collectively, Plan participants would have saved millions in fees and would have realized millions more in growth throughout the Class Period.

174.   Indeed, had the Plan's fiduciaries included the Vanguard Equity-Income Fund, the DFA U.S. Large Cap Value III Portfolio, and the Vanguard Mega Cap Value Index Fund in lieu of the investment options in the WF Large Cap Value Fund, Plan participants would have paid the following fees for the 2011 through 2016 Plan years:



175.   As demonstrated in the chart above, the Vanguard Equity-Income Fund, the DFA U.S. Large Cap Value III Portfolio, and the Vanguard Mega Cap Value Index Fund would have charged Plan participants fees more than 50% less than those charged by the non-proprietary Large Value Funds.  Thus, had the Plan's fiduciaries diligently exercised their fiduciary duties of prudence and loyalty and included these funds instead, Plan

participants would have saved millions in fees and would thus have had more money for retirement.[28]

176.   Moreover, the fact that cheaper market alternative ***mutual funds*** were available in lieu of two of the non-proprietary Large Value Funds—the T. Rowe Fund and the MFS Fund—which are CITs or separate accounts, demonstrates that the Plan's fiduciaries did not diligently exercise their fiduciary duties of prudence and loyalty and that the fees being paid by the Plan participants were excessive and unreasonable. Throughout the Class Period, the T. Rowe Fund has charged an expense ratio of between 45 basis points and 40 basis points whereas the MFS Fund has charged an expense ratio of between 38 basis points and 37 basis points.  These fees were and are more than twice the 22 basis points to 13 basis points charged, throughout the Class Period, by the Vanguard Equity-Income Fund (22 basis points to 17 basis points from 2011 to 2015) and the DFA U.S. Large Cap Value III Portfolio (14 basis points to 13 basis points from 2011 to 2015), which are both mutual funds that do not have the same cost cutting abilities as CITs and separate accounts.

177.   Additionally, as noted above, CITs or separate accounts that maintain the amount of assets Plan participants maintained in the non-proprietary Large Value Funds (averaging $450 million for each fund at the beginning of the Class Period and over $700 million for each fund at the end) command cheaper expense ratios.

---

[28] In fact, the true cost to Plan participants is higher as they also missed out on the growth that they would have realized on the growth of the money they would have saved from paying the lower fees.  These funds also outperformed the non-proprietary Large Value Funds throughout the Class Period.

178.   For example, PIMCO requires a $100 million investment for its RAE Fundamental U.S. Large Cap separate account.  For such an account, PIMCO charges 30 basis points for the first $50 million, 25 basis points for the next $50 million, and 20 basis points for anything thereafter.  Such an account would have charged Plan participants 22 basis points for managing the $450 million allocated for each investment option in the WF Large Cap Value Fund at the beginning of the Class Period and 21 basis points for the $700 million allocated towards the end of the Class Period.  Such fees are almost half the fees charged by the T. Rowe Fund and the MFS Fund.  Thus, had the Plan's fiduciaries hired PIMCO to create at least one of the investment options for the WF Large Cap Value Fund, Plan participants would have saved millions in fees.

179.   Cheaper and better performing alternatives also existed for the Dodge & Cox Stock Fund, the only mutual fund in the WF Large Cap Value Fund.  For example, had the Plan's fiduciaries conducted a systematic review of the investment options in the WF Large Cap Value Fund at the beginning of 2011, they would have discovered that cheaper and better performing market alternatives were available to the Plan.  As demonstrated in the chart below, the DFA U.S. Large Cap Value III Portfolio had outperformed the Stock Fund on a one, five, and ten year basis for the period ending December 31, 2010[29]:

---

[29] The DFA U.S. Large Cap Value III Portfolio and the Stock Fund have been in same asset category (Large Value) and have had the same benchmark index, the Russell 1000 Value, throughout the Class Period.  Additionally, the DFA U.S. Large Cap Value III Portfolio also outperformed the Stock Fund for the one, five, and ten year periods ending December 31, 2015.



180.  A systematic review of the Plan's investment options would have revealed the better performing and cheaper market alternative (in 2011 the DFA U.S. Large Cap Value III Portfolio charged a fee of 14 basis points whereas the Stock Fund charged a fee of 42 basis points).  At the beginning of the Class Period, the cost and performance superiority of the DFA U.S. Large Cap Value III Portfolio would have been evident to a prudent and loyal fiduciary.  Accordingly, the Plan's fiduciaries did not need the benefit of hindsight afforded in 2017 to understand that if Plan participants' assets were invested in the lower cost and better performing investment option available at the beginning of the Class Period, they would have higher returns and, therefore, more money for retirement.  Therefore, the Plan fiduciaries' failure to replace the Stock Fund with the DFA U.S. Large Cap Value III Portfolio, or a similar cheaper and better performing fund, or to take any of the other cost cutting measures described herein, demonstrates that they breached their fiduciary duties to prudently and loyally manage the Plan's assets and consequently cost Plan participants millions in unnecessary fees.

(v)    **The Unreasonably High Fees of the Emerging Markets Equity Fund Cost the Plan Millions**

181.    During the whole of the Class Period, the Plan's fiduciaries maintained the Lazard Emerging Markets Equity Fund ("Emerging Markets Fund") in the Plan.[30]  The Emerging Markets Fund benchmarked the MSCI Emerging Markets Index, and for the five year and one year periods ending on December 31, 2015, the Emerging Markets Fund lagged its benchmark index and a cheaper alternative peer fund, the DFA Emerging Markets II Fund (DFETX) ("DFA Emerging Markets Fund").

182.    The chart below compares the performance of the Emerging Markets Fund, the MSCI index, and the DFA Emerging Markets Fund for the one year and five year periods ending December 31, 2015:



183.    For performance lagging the benchmark index and the DFA Emerging Markets Fund, Plan participants paid between 95 basis points and 90 basis points in fees

---

[30]    Early in the Class Period the Emerging Markets Fund was named the Lazard/Wilmington Emerging Markets Equity Fund.

during the Class Period.  If the Plan's fiduciaries had replaced the Emerging Markets Fund with the DFA Emerging Markets Fund, Plan participants would have paid between 38 basis points and 34 basis points (almost three times less) during the Class Period. Such a change would have saved Plan participants millions of dollars in unnecessary fees paid for the 2011 through 2015 Plan years.[31]

184.   Moreover, Plan participants paid between 95 basis points and 90 basis points throughout the Class Period even though the assets Plan participants maintained in the Emerging Markets Fund increased from $427.88 million in 2011, to a high of $629.76 million in 2014, and to $524.9 million in 2015.  For the amount of assets invested in the Emerging Markets Fund, Plan participants were paying an exorbitantly high fee as compared to both *mutual fund* fees (as demonstrated above) and the fees charged by other investment managers.

185.   For example, PIMCO requires a $100 million investment for its RAE Fundamental Emerging Markets separate account.  For such an account, PIMCO charges 50 basis points for the first $50 million, 45 basis points for the next $50 million, and 40 basis points for anything thereafter.   Such an account would have charged Plan participants 42 basis points for managing the $427.88 million at the beginning of the Class Period, 41 basis points for the $629.76 million allocated in 2014, and 42 basis points for $524.9 million allocated in 2015.  Such fees are more than half the fees charged by the Emerging Markets Fund.  Thus, had the Plan's fiduciaries hired PIMCO

---

[31] In fact, the true cost to Plan participants is higher as they also missed out on the growth that they would have realized on the growth of the money they would have saved from paying the lower fee.

to create and manage an actively managed emerging market fund, Plan participants would have saved millions in fees.

*******

186.    As demonstrated above, at all times throughout the Class Period, the Plan's fiduciaries failed to leverage the size of the Plan's substantial assets to negotiate or create lower fee investment options in lieu of the proprietary and non-proprietary funds included in the Plan.  A prudent and loyal fiduciary would have leveraged the size of the Plan's assets to negotiate lower fees for the Plan's investment options or leveraged that size to seek out cheaper funds.  Tellingly, the aggregate fees that the Plan's participants paid for the proprietary and non-proprietary investment options described above, did not substantially change, if at all, throughout the Class Period.  Such little movement in the fee demonstrates that the Plan's fiduciaries failed to leverage the size of the Plan's growing assets to negotiate or create lower fee investment options for Plan participants.

187.    No reasonable explanation can justify the Plan's fiduciaries' failure to diligently exercise their fiduciary duties of prudence and loyalty by not taking any of the possible cost cutting actions described above, including:  removing costly and poorly performing proprietary funds; not leveraging the size of the Plan's assets to negotiate or create lower expense ratio investment options; not seeking alternative investments that charge lower expense ratios; and/or not constructing alternative investment vehicles that provide the same asset fund but at a lower expense ratio earlier.

188.    Thus, as a direct and proximate result of Defendants' breaches of fiduciary duties, namely (1) belatedly converting the WF Target Funds into lower fee CITs, (2)

failing to seek cheaper and better performing market alternatives, for both proprietary and non-proprietary investment options, and (3) not leveraging the size of the Plan's assets to negotiate lower fees for the Plan's investment options, Plan participants paid millions in excessive and unnecessary fees and suffered millions in performance losses.

## VIII.  DEFENDANTS BREACHED THEIR FIDUCIARY DUTY TO AVOID CONFLICTS OF INTEREST

189.    By selecting and retaining the proprietary mutual funds run by Wells Fargo's affiliated companies, Defendants have acted at all times in the interest of the Company, and have not acted solely in the interests of the Plan participants as is required of a fiduciary under ERISA, who are required to serve the Plan loyally with an "eye single" to the Plan.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); 29 U.S.C. § 1104(a)(1)(B); *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781 SRN/JSM, 2012 WL 5873825, at *8 (D. Minn. Nov. 20, 2012)

190.    Defendants have a conflict of interest that prevented them from carrying out their fiduciary duties in a manner consistent with ERISA.  Despite this conflict of interest, Defendants have failed to appoint fiduciaries who could carry out their duties to protect the Plan's participants in a manner consistent with ERISA or to take other appropriate steps to address the conflict.

## IX.    CLAIMS FOR RELIEF UNDER ERISA

191.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

192.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

193.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary that have been made through the use of plan assets by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

194.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to plan solely in the interest of the participants and their beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

195.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting

*Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982)).  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into and continually monitor the merits of all the investment alternatives to a plan's investment options;

(b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)    A duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

196.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless

he makes reasonable efforts under the circumstances to remedy the breach.

197.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of Defendants' breaches of fiduciary duties for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## FIRST CLAIM FOR RELIEF
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

198.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

199.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

200.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that the plan's investment options are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Defendants were responsible for ensuring that all investment options available to the Plan participants were prudent and that such investments were consistent with the purpose of the Plan the ERISA fiduciary duties.  Defendants are liable for losses and excessive fees incurred as a result of the above identified investment options being imprudent.

201.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

202.    Moreover, ERISA § 404 (a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

203.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, Defendants knew or should have known that, as described herein, the proprietary and non-proprietary funds, which are detailed above, were not suitable and appropriate investment options for the Plan.  The proprietary and non-proprietary funds included in the Plan during the Class Period, whether by excessive fees or sustained, poor performance, clearly did not serve Plan participants' interests.  Yet, during the Class Period, despite their knowledge of the imprudence of the above investments, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable excessive costs and the loss of earnings that resulted or Defendants took action long after Plan participants had suffered the consequences of high fees and poor performance.

204.   Defendants additionally breached their duties to prudently and loyally manage the Plan's assets by failing to have in place a method of systematic review both of the Plan's individual investment options and of the portfolio as a whole in order to ensure that the investment options were suitable and appropriate for the objectives of the Plan.  If Defendants had had in place a reasonable method of systematic review, the underperforming and excessively high fee proprietary and non-proprietary mutual funds and CITs/CIFs would have been replaced or the fees would have been negotiated lower. Such a review process would have revealed that the Plan maintained significant assets in its investment options that would have allowed Defendants to leverage those assets to negotiate or create lower fee investment options for Plan participants.

205.   Defendants further breached their duties of loyalty and prudence by failing to ensure that participants liquidated their investments in the proprietary funds and transferred the sale proceeds to the other investment options available in the Plan.  With actual or constructive knowledge that Plan participants did not have full and complete information about the Company's interest in these funds, and thus were unable to make fully informed decisions about where to retain their holdings in the proprietary funds, Defendants had the fiduciary obligation to either inform Plan participants of the need to take action to protect their financial interest, or, if necessary, to liquidate the Plan's holdings of the proprietary funds on participants' behalf to ensure that they did not suffer a financial loss.

206.   Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the self-

interest of the Company in retaining the excessively expensive and poorly performing proprietary investment options and in failing to negotiate or create lower fee alternatives to the proprietary investment options so as to benefit Wells Fargo and its affiliates' profits.  Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

207.    Lastly, Defendants also breached their duties to prudently and loyally manage the Plan's assets by including and maintaining a proprietary money market fund alongside a cheaper and better performing stable value fund.  By including the money market fund alongside the stable value fund, Defendants allowed Plan participants to lose a significant amount of money due to higher fees and the inflation adjusted negative growth rate of the money market fund.  As presented above, Defendants were aware at all times before and after the Class Period of the poor performance of the proprietary Money Market Fund but yet chose to include and maintain the Money Market Fund in the Plan.

208.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of the retirement investment.  Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in the proprietary funds and thereby eliminated, or at least reduced, losses to the Plan.

209.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Breaches of Fiduciary Duties in Violation of § 404 by Wells Fargo, the HR**
**Committee Defendants, and the Chief Administrative Officer Defendants (the**
**"Monitoring Defendants"))**

210.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

211.    At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

212.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Monitoring Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including without limitation, the members of the various committees and others to whom fiduciary responsibilities were delegated.

213.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.   In this case, that means that the monitoring fiduciaries had the duty to:

(a)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the plan, the goals of the plan, and the behavior of the plan's participants;

(b)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the plan's investments;

(d)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the plan's investments; and

(f)    Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hand-on fiduciaries.

214.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when the monitoring fiduciaries are not.  In addition, monitoring fiduciaries must provide the monitored fiduciaries with complete and accurate information in the monitoring fiduciaries' possession that they know, and reasonably should know, the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

215.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:  (1) failing to adequately disclose the conflict of interest that existed between the Company and the proprietary funds and the significant fees the Company and its affiliates earned from Plan Participants; (2) failing to monitor and evaluate the

performance of the proprietary and non-proprietary funds such that the Plan lost millions of dollars to unnecessary excessive fees and poor fund performance; (3) failing to monitor the processes and policies by which the Plan's investments were selected, allowing the Plan's assets to remain in the imprudent investment options detailed above rather than in lower fee, similar mutual funds, better performing investments or other investment alternatives such as collective trusts and separate accounts; and (4) failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent and excessively costly investments within the Plan, to the detriment of the Plan and Plan participants' retirement savings.

216.   The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the monitored fiduciaries' breaches, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

217.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

218.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**PRAYER FOR RELIEF**

220.   WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties to the participants;

B.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duty;

D.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.     An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the proprietary and non-proprietary funds maintained by the Plan in proportion to the accounts' losses attributable to excessive fees and underperformance of these investments;

F.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary

relief against the Defendants.

Dated: November 17, 2017          Respectfully submitted,

                                  **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

                                  By:   /s/  Robert K. Shelquist
                                        Robert K. Shelquist, #21310X
                                        Rebecca A. Peterson, #392663
                                  100 South Washington Avenue, Suite 2200
                                  Minneapolis, MN 55401
                                  Telephone:  (612) 339-6900
                                  Facsimile:  (612) 339-0981
                                  rkshelquist@locklaw.com
                                  rapeterson@locklaw.com

                                  **KESSLER TOPAZ MELTZER &**
                                  **     CHECK, LLP**
                                  Mark K. Gyandoh
                                  (*pro hac vice* motion to be filed)
                                  Julie Siebert-Johnson
                                  (*pro hac vice* motion to be filed)
                                  280 King of Prussia Road
                                  Radnor, PA 19087
                                  Tel:  (610) 667-7706
                                  Fax:  (610) 667-7056
                                  mgyandoh@ktmc.com
                                  jsjohnson@ktmc.com

                                  ***Counsel for Plaintiff***